AO 91 (Rev. 11/11) Criminal Complaint (approved by AUSA Justin Ashenfelter)                                    19-088

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>ABELARDO CABALLERO LEON<br>JESUS BUSTAMANTE-VALDEZ<br>MARCO CASTRO<br><br>*Defendant(s)* | Case No. 19-1276-M-1 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __early 2018 to May 22, 2019__ in the county of __Philadelphia__ in the __Eastern__ District of __Pennsylvania__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(b)(1)(A) | Conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine |

This criminal complaint is based on these facts:
See affidavit attached.

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent William Doherty, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __7/25/2019__

_____
Judge's signature

City and state: __Philadelphia, Pennsylvania__    Hon. Carol S. Wells
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT

I, William Doherty, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, assigned to the Philadelphia Division. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I have been employed as a Special Agent since April 2012 and during this time, I have received instruction and on-the-job training in various aspects of law enforcement. As part of my duties with the FBI, I investigate violations of federal criminal law over which the FBI has jurisdiction, including violent crimes, gangs, drug trafficking organizations and other violent criminal elements. Over the course of these investigations I have conducted interviews of witnesses, victims and suspects, participated in physical and electronic surveillance, utilized pen registers and trap and trace devices, applied for and received numerous search and seizure warrants and arrest warrants. I have participated in searches authorized by consent, search warrants and other legal grounds, for residences, businesses, cellular telephones and vehicles for the purpose of obtaining evidence. While employed by the FBI, I have also participated in investigations classified under the Organized Crime Drug Enforcement Task Force ("OCDETF"), which is a national initiative focused on targeting drug trafficking organizations.

3. The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents and witnesses, review of recordings and documents and other evidence developed during the investigation. This affidavit is intended to

show merely that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter. Any observations not made by me, were made by other law enforcement officers involved in the investigation whom I know to be reliable and trustworthy.

4. Based on the facts set forth below, your affiant submits there is probable cause to believe that ABELARDO CABALLERO LEON ("LEON"), JESUS BUSTAMANTE-VALDEZ ("BUSTAMONTE"), and MARCO CASTRO ("CASTRO") have committed the crime of conspiracy to distribute approximately 500 grams or more of methamphetamine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(A).

## FACTS ESTABLISHING PROBABLE CAUSE

5. In May 2018, law enforcement officers assigned to the FBI Philadelphia Field Office, initiated an investigation into an organization distributing bulk crystal methamphetamine (meth) and cocaine in and around Philadelphia, Pennsylvania (PA) which is located in the Eastern District of Pennsylvania (EDPA).

6. On November 7, 2018, law enforcement officers assigned to FBI Philadelphia, Violent Gang Task Force, executed a series of federal search warrants and consent searches targeting this drug distribution network, which represented the culmination of a six-month investigation.

7. During the enforcement operation, your affiant interviewed Cooperating Witness 1 (CW1). CW1 has a criminal history that includes, among other things, a federal drug trafficking conviction in New York and a state felony drug trafficking conviction in 2004. CW1 is cooperating in exchange for possible consideration on pending drug trafficking charges. CW1 stated that earlier in the day, he/she sent three packages containing a large amount of United

States Currency (USC) to various addresses in Arizona. CW1 said the packages were payment to CW1's supplier for cocaine and crystal methamphetamine that was purchased for CW1 and his/her associate. CW1 estimated that each package contained between $25,000 and $35,000. CW1 stated that his/her narcotics supplier was "ABE LEON."

8. CW1 directed law enforcement officers to review his/her cell phone in order to discover a UPS payment receipt for three packages and three shipping receipts. CW1 said the addresses in Arizona were provided to him/her by LEON and were the "receivers." CW1 explained that the term "receivers" meant addresses where packages were sent containing packages of USC representing payment for narcotics. Law enforcement officers recovered the three shipping receipts to various addresses in Arizona.

9. On November 16, 2018, law enforcement officers again met with CW1. CW1 confirmed the crystal methamphetamine seized during the November 7, 2018 enforcement operation came from LEON. CW1 estimated that he/she began purchasing crystal methamphetamine and cocaine from LEON in early 2018. CW1 said LEON and CW1 devised a process by which smaller amounts of crystal methamphetamine and cocaine where shipped to addresses in Philadelphia, and payment for the narcotics was shipped to addresses in Arizona. CW1 provided LEON with the addresses in Philadelphia to send the narcotics to and LEON provided CW1 with addresses in Arizona to send the payment to. CW1 said this process resulted in a constant stream of narcotics flowing to Philadelphia and money flowing to LEON in Arizona. CW1 said they originally used FedEx for shipping narcotics and USC but eventually switched to UPS because more packages were being interdicted with FedEx.

10. CW1 estimated he/she placed the first order with LEON in early 2018 and recalled that the order was for 20 pounds of crystal methamphetamine and that it cost $2,500 per

pound. CW1 said by the end of the summer 2018, the size of the crystal methamphetamine orders had significantly increased.

11. CW1 recalled when he/she first sent money to LEON, CW1 sent it to LEON's house. CW1 recalled he/she sent approximately $24,000 to LEON. After the package was delivered, LEON instructed CW1 not to send any more packages to that address and not to use LEON's true name on future packages. CW1 said LEON told him/her that he would provide CW1 with names and addresses to where CW1 should sent packages containing USC. Your affiant knows this package to have originated from CW1 and sent on 03/26/2018 to ABELARDO LEON, 18869 W Jacqueline Ave, Case Grande, AZ 85122.

12. For reference, your affiant has identified two packages sent by CW1 to JESUS BUSTAMANTE at 8316 N 55th Ave, Glendale, AZ 85302. One package was sent on April 17, 2018, and one was sent on April 23, 2018. On April 23, 2018, CW1 also sent a package to 6545 N 59th Drive, Glendale, AZ 85301, but to a name believed to be an alias. CW1 could not recall specifically how much money he/she sent in each package but only sent money to Arizona when sending packages.

13. In early February 2019, at the direction of your affiant, CW1 contacted LEON through WhatsApp. LEON and CW1 proceeded to discuss a 5-pound crystal meth deal under the auspices of starting slow due to the length of time between their last drug transaction. Ultimately, LEON and CW1 agreed to a 10-pound crystal methamphetamine deal.

14. On February 11, 2019, CW1 received a WhatsApp message from LEON that showed the tracking number for a UPS package originating out of the UPS Store located at 5156 W Olive Ave, Glendale, AZ, 85302. On the scheduled delivery date, law enforcement officers recovered a UPS package with matching tracking number. The package did not appear to be

tampered with or otherwise opened prior to being received by law enforcement officers in Philadelphia, PA.

15. Inside this package, law enforcement officers recovered five vacuum and heat-sealed bags, each containing two cylindrical objects wrapped in carbon paper. These cylindrical objects were further opened to reveal gallon zip-lock style bags containing broken cloudy shards of suspected crystal methamphetamine. The suspected narcotics were field tested and tested positive for the presence of narcotics. The narcotics were subsequently submitted to the Philadelphia Police Department Chemistry Lab for analysis. The lab report concluded that the submitted items contained a detectable amount of methamphetamine. The packaging of the crystal meth was consistent in technique and uniformity of the packages seized on November 7, 2018.

16. During the surveillance and UPS package recovery operation on February 18, 2019, your affiant learned that a Deputy Sheriff from Pinal County, Arizona, placed a law enforcement hold on the package containing the 10 pounds of crystal methamphetamine and intended for CW1. Your affiant spoke with Pinal County Deputy Sheriff (PCDS) Travis Williams who relayed the following information.

17. On February 12, 2019, PCDS Williams conducted a traffic stop on a shuttle van on Interstate 10 in southern Arizona. During the course of the traffic stop PCDS Williams observed two heat sealed bundles of USC in the center console. PCDS Williams noted that these two bundles were not in that location during his initial contact with the driver. PCDS Williams identified the front passenger in the van as MARCO CASTRO based on his legal permanent residence card and subsequently detained him based on PCDS Williams training and experience. PCDS Williams found an additional $4,000 on CASTRO'S person.

18.     CASTRO was transported to a Pinal County Sheriff's Office substation for processing. CASTRO was advised of his Miranda Rights and agreed to speak with PCDS Williams. CASTRO stated he was traveling from Phoenix, AZ, to Nogales, Sonora, Mexico to visit his ex-wife, but would return to Phoenix later that evening.

19.     CASTRO admitted that the heat-sealed bundles of USC recovered in the van belonged to him and the money on his person also belonged to him. CASTRO estimated the total to be approximately $18,000. Law enforcement officers subsequently identified the amount to be $16,495.

20.     PCDS Williams also recovered a UPS shipping receipt from CASTRO'S clothing. The receipt showed the matching tracking number that LEON provided to CW1 and that originated from the UPS Store at 5156 West Olive Ave, Glendale, AZ and sent of February 11, 2019. According to PCDS Williams report, initially, CASTRO denied ownership of the shipping receipt but upon his review of the receipt confirmed it was his. CASTRO recalled he was shipping an old laptop to a friend in Pennsylvania but was unable to recall the friend's last name. According to PCDS Williams' report, CASTRO ultimately admitted to shipping the package at the request of another person and assumed the package contained narcotics. CASTRO estimated he sent a package once a month and was paid approximately $300 per package.

21.     CASTRO said he works with his roommate, "JESUS VALDEZ" (BUSTAMANTE) and they live together at 8316 N 55th Ave, Glendale, AZ. CASTRO said VALDEZ rents the residence and CASTRO pays approximately $550 per month for rent and $100 per month for utilities.

22.     On March 7, 2019, CW1 and LEON had a conversation through WhatsApp. LEON explained to CW1 that one of LEON's associates was stopped by law enforcement with

approximately $18,000 while he was traveling back to "his country." LEON reassured CW1 that he/she did not have to worry because LEON was not going to work with this "associate" anymore.

23. On April 1, 2019, FBI Special Agent Ryan Poulin, made contact with CASTRO in Phoenix, AZ. During the course of the interview, CASTRO admitted to sending 10-12 packages at the request of JESUS VALDEZ BUSTAMANTE and had mailed approximately one package per week for the previous three months. CASTRO knew the packages contained crystal methamphetamine because BUSTAMANTE told him they contained crystal methamphetamine. BUSTAMANTE directed CASTRO not to use his true name or address when sending the packages. CASTRO said the last package he sent was sent sometime in February 2019.

24. CASTRO further explained that when he was directed to send a package, BUSTAMANTE would provide him with the sealed package and drive him to a UPS shipping point. CASTRO recalled sending packages from UPS locations located at 59th Ave; West Olive Ave; and 67th Ave; all in Glendale, AZ. Most of the packages CASTRO mailed for BUSTAMANTE were sent to Philadelphia, PA; Massachusetts, and Lubbock, Texas.

25. CASTRO recalled one occasion where he traveled with BUSTAMANTE to Lubbock, TX to pick up approximately $30,000 and then drove the USC back to Phoenix. CW1 said the $30,000 was packaged in vacuum sealed bags. CASTRO said BUSTAMANTE also collects money around Phoenix in order to transport the money down to Nogales, Sonora.

26. CASTRO said BUSTAMANTE has a friend named "ABE" who lives is Casa Grande, AZ. CASTRO and BUSTAMANTE have been to ABE's house together. CASTRO said BUSTAMANTE and ABE know each other because they are both from the same town in Mexico.

27. In early March, 2019, law enforcement officers directed CW1 to place another crystal methamphetamine order with LEON via WhatsApp. On March 7, 2019, CW1 received a text message from LEON containing the tracking number for a UPS package. The tracking number showed the package originated at the UPS store located at 9524 W Camelback Rd, Glendale, AZ.

28. On March 14, 2019, law enforcement officers took possession of the UPS package bearing the same tracking number as provided by LEON. The package appeared to be intact and showed no signs of being tampered with or otherwise opened. Inside the package, law enforcement officers discovered a second brown U-Haul box. Inside this box law enforcement officers removed a plastic storage bin filled with packing peanuts and three, vacuum/heat sealed bags containing cylindrical objects wrapped in carbon paper. Inside the carbon paper, law enforcement officers discovered clear bags containing broken cloudy shards of suspected crystal methamphetamine. The suspected narcotics were sent to the Philadelphia Police Department Chemistry Lab for analysis. The lab report confirmed the substance to contain a detectable amount of methamphetamine totaling approximately 8.8 pounds of methamphetamine. For reference, the methamphetamine was not submitted for purity testing due to the volume of seized narcotics.

29. On March 26, 2019, CW1 and LEON had another WhatsApp conversation that CW1 recorded at the direction of law enforcement. CW1 said he/she wanted to place one more order for five pounds of crystal methamphetamine before switching to in-person purchases in Phoenix, AZ. CW1 and LEON agreed to meet in Phoenix, AZ in May 2019. LEON also informed CW1 that he had a new method for transporting narcotics and would go over the details when they meet in person.

30. On March 25, 2019, LEON sent CW1 the following address to send payment for the upcoming five pounds: JESUS CASTILLO, 6545 N 59th Drive, Glendale, AZ 85301. On March 29, CW1 sent a package containing $12,500 via UPS to the address provided by LEON. On April 2, 2019, LEON informed CW1 that the package was received.

31. On April 2, 2019, law enforcement officers assigned to the FBI Phoenix Field Officer conducted surveillance in support of the delivery of the UPS package from CW1. Law enforcement officers established surveillance in the vicinity of 6545 N 59th Drive, Glendale, AZ. Law enforcement officers observed the UPS package get delivered and received by an unknown Hispanic female who answered the door.

32. On April 8, 2019, CW1 and LEON had a WhatsApp conversation that was recorded by CW1. LEON said at the onset of the call, "he is doing it right now." CW1 understood this to mean an associate of LEON's was packaging the five pounds of crystal meth. LEON also said he "gave him that" which CW1 understood to mean LEON gave his associate the address provided by CW1 where the crystal meth was to be sent in Philadelphia, PA. During this call, CW1 inquired about purchasing fake prescription medication pills from LEON. LEON told CW1 that he could fill any order for CW1. CW1 asked if he/she could get 1,000 pills and what the cost would be. LEON responded he could supply 50,000 pills with ease.

33. On April 13, 2019, LEON sent a screen shot of a UPS tracking number for a package that originated from 5156 W Olive Ave, Glendale, AZ 85302. On April 16, 2019, law enforcement officers took possession of a UPS package bearing the same tracking number provided to CW1 by LEON. The package did not appear to be tampered with or otherwise opened. Inside the UPS package, law enforcement officers discovered a small brown cardboard box. Inside this cardboard box, law enforcement officers removed a clear plastic storage bin


containing three vacuum sealed bags, each containing a cylindrical object wrapped in carbon paper. Each package contained broken cloudy shards of suspected crystal methamphetamine inside a gallon Zip-lock bag. The suspected crystal methamphetamine was submitted to the Philadelphia Police Department Chemistry Lab for analysis and the amount was confirmed to contain a detectable amount of methamphetamine and weighed approximately three pounds.

34. Law enforcement officers directed CW1 to contact LEON regarding the disparity between having sent money for five pounds of crystal meth but only receiving three pounds of crystal meth. On April 16, 2019, CW1 contacted LEON on WhatsApp. LEON asked CW1 for a picture of the shipping label to see if the weights matched and CW1 sent several photos. LEON texted CW1:

"Said he put 5;"

"He said he put 5 different parts in there;"

"He is 100 % sure;"

"He's been helping out sinse the beginning;" and

"He'll be in tomorrow."

LEON concluded that either he or CW1 was getting robbed. LEON also said he was going to make another box identical to the one sent to CW1 to see what the weight was supposed to be. It is believed LEON was going to go through this effort to compare the weights on the shipping labels. Ultimately, CW1 and LEON agreed to resolve the matter when they met in person in Phoenix.

35. On May 20, 2019, CW1 met in person with LEON and BUSTAMANTE in Phoenix, AZ. Law enforcement officers were able to monitor the conversation simultaneously between LEON, BUSTAMANTE and CW1. They were heard discussing the different

possibilities for the pending deal. LEON offered to drive the 10 pounds of crystal methamphetamine to CW1's hotel. LEON said he would drop off the crystal meth, collect the money from CW1 for one kilogram of cocaine, and then deliver the kilogram of cocaine to CW1 the following morning. BUSTAMANTE expressed his concern about making two trips with narcotics and the group collectively agreed to complete the entire deal the following day at the same time.

36. At the conclusion of the meeting, CW1 and LEON had an additional conversation. LEON said he was going to provide the 10 pounds of crystal methamphetamine plus two additional pounds of crystal methamphetamine to make up for the deficiency from the previous package that only had three pounds if crystal methamphetamine instead of the purchased five pounds. LEON told CW1 he was going to include a sample of prescription pills that they had previously discussed. At the conclusion of the meeting, LEON and BUSTAMANTE departed the area.

37. On the morning of May 22, 2019, LEON contacted CW1 to arrange a meeting location to make the exchange of narcotics. LEON reminded CW1 that he/she needed to provide the money for the kilogram of cocaine up front but that LEON would bring the 12 pounds of crystal methamphetamine to the meeting location first.

38. CW1 and CW1's vehicle were searched by law enforcement for contraband with negative results. CW1 was provided $50,000 for payment. The $50,000 was packaged into two separate bundles. One bundle was $27,000 for the payment for the kilogram of cocaine. This bundle was wrapped in a blue rubber band. The second bundle was $23,000 and was for payment for the crystal methamphetamine. CW1 was provided a covert recording/transmitting device and was followed by surveillance units to the meeting location as directed by LEON. While in transit

to the meeting location, LEON contacted CW1 and said he wanted to show CW1 a nice car when CW1 got to the meeting location.

39. CW1 arrived at the meeting location, an industrial warehouse, and was directed to park in the rear of the building. At the time, an FBI surveillance aircraft was orbiting overhead and was able to monitor the activity. When CW1 arrived at the rear of the complex, CW1 told law enforcement that he/she observed a dark Nissan Sentra and BUSTAMANTE and LEON standing near by the vehicle. CW1 asked LEON if he wanted the money right then but LEON said he wanted to show CW1 a "trap" in the Nissan Sentra. CW1 said LEON directed CW1 to look in the back seat of the Nissan Sentra. CW1 said LEON reached in the front driver's seat and did an unknown combination that released the trap along the back rest of the rear seat. CW1 said the compartment was hydraulic and could easily fit a large amount of bulk narcotics and/or USC.

40. CW1 said he/she observed a suitcase in the back seat of the Nissan Sentra. BUSTAMANTE-VALDEZ removed the suitcase from the back seat and placed it on the ground. LEON said CW1 could not take the suitcase because it had some of BUSTAMANTE'S clothing in it. CW1 then said BUSTAMANTE then removed a trash bag from the suitcase and placed the bag into the trunk of CW1's vehicle. CW1 said he/she provided LEON with the bundles of USC.

41. After the exchange was concluded, LEON invited CW1 continued to converse near LEON's Chevrolet pickup truck. CW1 said at one point, he/she looked into the vehicle and observed the bundle of USC that was wrapped with the blue rubber band on the floor of LEON'S truck. As a reference, this bundle was $27,000 and represented payment for the kilogram of cocaine.

42. CW1 returned to his/her vehicle and departed the area while law enforcement surveillance units followed. At the meeting location with CW1, law enforcement officers

searched CW1 and CW1's vehicle for contraband with negative results. In the trunk of the car, law enforcement officers recovered a trash bag containing four, vacuum sealed bags, each containing three cylindrical or flat shaped objects wrapped in carbon paper. These packages were nearly identical to every other package of crystal methamphetamine recovered by law enforcement during the course of the investigation. Law enforcement officers also recovered a vacuum-sealed bag containing a brick shaped object, wrapped in carbon paper, suspected of being one kilogram of cocaine.

43. The seized narcotics were field tested for the presence of cocaine and methamphetamine and both tests were positive. The narcotics were subsequently submitted to the Philadelphia Police Department Chemistry Lab for further analysis. The laboratory analysis showed the submitted items to be 11.5 pounds of a substance containing methamphetamine; one kilogram of cocaine and 50 pills with a detectable amount of fentanyl totaling approximately five grams.

44. The following week, CW1 was directed by law enforcement to contact LEON. CW1 said he/she returned to Philadelphia without incident and had taken possession of the narcotics without issue. LEON expressed relief and relayed that he was a little nervous.

## SUMMARY OF PROBABLE CAUSE

45. Based upon the investigation to date, your affiant submits that LEON is a narcotics trafficker who has been purposefully directing the shipment of dozens of pounds of methamphetamine into the Eastern District of Pennsylvania between 2018 and 2019. Moreover, your affiant submits that LEON has received cash payments for the methamphetamine shipped to this jurisdiction through the mailings in an effort to conceal the profits of his drug enterprise.

46. Based upon the investigation to date, your affiant submits that BUSTAMANTE has assisted and coordinated the shipments of dozens of pounds of methamphetamine into the Eastern District of Pennsylvania between 2018 and 2019.

47. Based upon the investigation to date, your affiant submits that CASTRO has shipped several pounds of methamphetamine into the Eastern District of Pennsylvania between 2018 and 2019.

## CONCLUSION

48. Based on the foregoing facts, your affiant submits that there is probable cause to believe that between early 2018, and May 22, 2019, in the Eastern District of Pennsylvania and in the District of Arizona, ABELARDO CABALLERO LEON, JESUS BUSTAMANTE VALDEZ and MARCO CASTRO committed the crime of conspiracy to distribute approximately 500 grams or more of methamphetamine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(A).

Respectfully submitted,

*William*

WILLIAM DOHERTY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 25, 2019

HON. CAROL S. WELLS
United States Magistrate Judge